# Benjamin F. Straus, Appellant, v. Citizens State Bank of Elmhurst, Appellee.

## Gen. No. 5,478.

1. APPEALS AND ERRORS—*when finding and judgment not preserved for review.* If the bill of exceptions does not show an exception preserved to a finding or judgment complained of, such finding or judgment is not preserved for review.

2. NEGOTIABLE INSTRUMENTS—*sections 16 and 58 construed.* Sections 16 and 58 of the Negotiable Instruments Act operated to change the rule previously existing in this state so that now conditions attaching to the delivery of a note need not be shown by documentary evidence but may be established by parol.

3. INTEREST—*power of Appellate Court to compute.* The Appellate Court in a proper case has authority to compute and allow interest.

Appeal from the Circuit Court of Du Page county; the Hon. MAZZINI SLUSSER, Judge, presiding. Heard in this court at the April term, 1911. Reversed and judgment here. Opinion filed October 13, 1911.

BOWLES & BOWLES, for appellant.

S. L. RATHJE and R. S. EGAN, for appellee.

MR. JUSTICE DIBELL delivered the opinion of the court.

Benjamin F. Straus sued the Citizens State Bank of Elmhurst, hereinafter called the Elmhurst Bank, to recover an unpaid balance of $1,000 upon a temporary loan of $2,000 alleged to have been made by Straus to the Elmhurst Bank on January 14, 1910, and filed the common counts. The Elmhurst Bank filed the general issue and pleas of set-off, based upon a note for $3,500, dated October 30, 1908, signed by Straus, payable to his order and by him endorsed, which the bank claimed to

hold against him. A jury was waived and it was stipulated that the issues should be considered made upon both sides and that each side could offer evidence as if proper pleadings had been filed. Proofs were heard by the court at various times and the court allowed the claim of Straus upon the temporary loan and allowed the set-off of the Elmhurst Bank upon the note and found a balance in favor of the Elmhurst Bank of $2804.76. Straus preserved exceptions and prosecutes this appeal therefrom. The Elmhurst Bank assigns cross errors upon the action of the court in allowing the claim of Straus upon the temporary loan.

At the times of the transactions involved in this suit, Emil Balgemann was cashier of the Elmhurst Bank, located in DuPage county, and he and Ernest Balgemann were stockholders therein; his brother, Ernest W. Balgemann, was president of the Crete State Bank, located in Will county; they both seem in some way to have been interested in or connected with the Dolton State Bank, located in Cook county; a brother, Emerick J. Balgemann, had frequent transactions with the Elmhurst Bank, as did also another brother, Ewald Balgemann; and an uncle, whose name does not appear in this record, either owned or was connected with the LaGrange State Bank in Cook County; and Straus was a stockholder in the Elmhurst Bank and in the Dolton Bank. The Crete Bank passed into the hands of a receiver early in 1909, and the Elmhurst Bank was in distress at least as early as January, 1910, and ceased to do business about July 1, 1910. The transactions between the Balgemanns were very much involved. Commercial paper, both good and bad and especially the latter, was passed back and forth from one bank to the other, sometimes for a consideration and sometimes without a consideration, sometimes with entries upon the books of the Elmhurst Bank showing what had been done, and sometimes without any entries whatever

showing the ownership or the transfer of securities.
When Emil and Ernest conducted a transaction relat-
ing to the interests or assets of the Elmhurst Bank,
they seldom knew, with any clearness, whether they
were acting for the bank or were conducting a personal
deal.   The evidence of Emil and of Ernest is full of
vagueness and uncertainty and shows a looseness in
financial transactions which could not fail to ruin any
bank, and these elements make it difficult to know how
far their testimony can be relied upon.   Appellant
called Ernest and appellee called Emil; but appellee by
other testimony, which we do believe, showed that Emil
had made many untruthful statements concerning the
financial transactions of the Elmhurst Bank, and where
his testimony conflicts with that of others we cannot
give it any substantial credence.   Straus was a note
broker, doing business in Chicago, and he had had
financial transactions with both Ernest and Emil so far
as to subject him, to some extent, to the suspicion of
unreliability which rests upon the evidence of Emil
and Ernest, although his testimony was much more
direct and straightforward.   We have tried to test
their testimony by the various facts otherwise estab-
lished, and thus have sought to ascertain what the facts
probably are.

On January 14, 1910, at his office in Chicago, Straus
loaned some one $2,000.   He testified that he loaned it
to the Elmhurst Bank through Emil Balgemann, its
cashier.   Emil testified in an uncertain and indirect
way, that he told Straus he was owing the Elmhurst
Bank and was getting this money for himself to fix up
his own account with the bank.   They disagree as to
who was present.   Straus testified that Emil and
George Thoma, then a director and later the cashier
of the Elmhurst Bank, came to him together and
applied for a loan of several thousand dollars for the
bank and that he told them he could not let them have

that much, but that he would see what he could do and for them to come back later, and that afterwards, on the same day, Emil came alone and the transaction was completed. Emil testified that Thoma did not go with him, but that his brother, Ewald, did at the first visit and that at that time the $2,000 was loaned, and that he afterwards, later in the day, went back to talk it over. Ewald was not a witness. Thoma testified that he was not there at that time, but that he was there at a later date, which he was afterwards able to fix as January 22, when he and Emil sought in vain a loan of $5,000 or $10,000 from Straus. In this respect, Straus appears to be in error as to the person present at the first meeting. The fact was that a heavy draft had been drawn the day before by the Elmhurst Bank upon the Fort Dearborn National Bank of Chicago in favor of either the uncle of the Balgemanns or the LaGrange Bank; and the Elmhurst Bank, which did its business through the Fort Dearborn Bank, did not have funds enough on deposit in the Fort Dearborn Bank to meet this draft and the other checks which were liable to come in during that and the succeeding day, and it was necessary for the Elmhurst Bank to get money from some source. Straus testified that Emil made the application to him in his capacity as cashier of the Elmhurst Bank. Emil offered to Straus a lot of commercial paper as security for the proposed loan, and this commercial paper was all the property of the Elmhurst Bank. Straus drew and delivered to Emil his check for $2,000 payable to the Elmhurst Bank, and Emil, as cashier of that Bank, endorsed the check and deposited it immediately in the Fort Dearborn Bank to the credit of the Elmhurst Bank. A very few days later Emil asked for and Straus let him take away two of the mortgages constituting said securities. A little later, on January 21, Emil came to Straus and said he had an opportunity to sell the remaining securities (the face value of which

was more than $2,000), and that if Straus would let
him take them, he would at once pay him the $2,000 with
the proceeds of the sale of said securities. Straus there-
upon delivered to Emil the remaining securities and
Emil gave therefor the receipt of the Elmhurst Bank,
by Emil Balgemann, its cashier. The bank did not pay
the loan at once as promised. In February Straus
called for payment and the bank sent him its draft for
$500 as part payment. Up to this point all the papers
show a transaction between Straus and the Elmhurst
Bank. Thereafter, on subsequent demands by Straus
for payment, Emil sent successively three of his per-
sonal checks, amounting in all to $500 as part payment
on the loan. On May 24, a meeting of the stockholders
of the bank was held, which Straus attended. He
claims that a schedule of the assets of the bank was
read, but that no itemized schedule of liabilities was
read, but that only the total of liabilities was stated. The
preponderance of the evidence is that a statement of
liabilities was read. This $1,000, due to Straus, was
not contained in said list of the liabilities of the bank,
and Straus said nothing publicly about it. Before the
meeting began Straus and Emil had a conversation, in
which Emil claims that he told Straus not to bring up
that matter and he would see it paid, and that Straus
said if Emil would pay it, it was all right. Straus did
not make known his claim for $1,000 to any other officer
of the bank till two months or so before this suit was
begun. The fact that the last three payments were by
the personal check of Emil and that Straus did not state
at the stockholders' meeting that the bank owed him
$1,000 are the only circumstances tending to show that
Straus did not loan the money to the bank. If Straus
loaned the money to the bank in the first instance, the
fact that Emil afterwards made some of the payments
with his personal check would not relieve the bank from
liability for the rest of the debt. Emil was owing the

bank all the time and any payment he made on a debt which the bank owed would reduce his indebtedness to the bank. At the stockholders' meeting no one was called upon to present his claim against the bank and his silence would not discharge the debt. From the facts that Emil obtained the loan upon securities owned by the bank, that the check was made payable to the Elmhurst Bank, that it was deposited to the credit of the Elmhurst Bank, that Emil receipted as cashier for the securities when he received them back, and that the first payment was made by a draft drawn by the Elmhurst Bank, we are clear that this was a loan by Straus to the Elmhurst Bank, which it has never paid, and that the conclusion of the court in favor of the plaintiff on that subject is sustained by the clear preponderance of the evidence. But further, we do not find that appellee preserved in the bill of exceptions any exception to the finding or judgment of the court allowing to appellant the unpaid balance of said loan, and therefore appellee has not preserved that ruling for review.

From the organization of the Elmhurst Bank till at least after it became financially embarrassed, if not till the present time, it has always held the note of Ernest W. Balgemann for $3,500. He subscribed for a majority of the stock and was not able to pay for it and so immediately borrowed $3,500 of what he had paid in and gave a note for that amount, which was renewed from time to time and stood on the books of the bank as one of its assets. In the fall of 1908 the Crete Bank, of which Ernest was president, was in embarrassed circumstances, and Emil said to Ernest that the note of the latter did not look good on the books of the Elmhurst Bank, and that he had better get some other note to take its place. On October 30, 1908, Emil and Ernest went to the office of Straus, and Straus then drew a note for $3,500 bearing that date and due in one year, payable to the order of himself, and he signed it and

endorsed it in blank and Emil carried it away. The testimony of Emil differs from that of Straus and Ernest as to what was said and as to the nature of the transaction, and the details were drawn out gradually on the various examinations of these witnesses at different dates as the trial was resumed from time to time. Emil claims that Ernest asked for the note as an accommodation to Ernest and that Straus delivered the note to Ernest and Ernest delivered it to Emil. Straus claims that Emil, as cashier of the bank, asked for the note to take the place of the note of Ernest on the books of the bank for the time being. Ernest appeared to be somewhat uncertain, but finally concluded that it was his best recollection that the note was delivered to Emil and not to himself. We are satisfied from the evidence that Straus was assured by both of them that he should not be liable on the note, and that he should not be required to pay it, and that it would be taken care of by the others, and that it was to be used temporarily to make the books of the bank look better than they did while showing the note of Ernest W. Balgemann as an asset. Whether this meant, look better to the bank examiner or to the directors or to the stockholders or to the depositors and patrons of the bank, does not appear. Two weeks later, on November 14, 1908, on the discount register some name of the maker of a note for $3,500 was erased and the name "B. F. Straus" was written over it. It appears to be the fact that the name so erased was "E. W. Balgemann." The note of Ernest W. Balgemann, however, remained in the bank, though eliminated from its discount register. The note of Straus became due October 30, 1909. Shortly thereafter by letter and by telephone, communications passed between Straus and Emil about the note. Straus and Emil do not wholly agree in their testimony as to what these communications were. We are satisfied that Straus demanded his note; that Emil told him it had

been taken out of the bank, cancelled and placed in Emil's private box; that on another demand a little later, Emil repeated the same statement and said it was marked "Paid" and was in his private box, and that it was so late in the afternoon he could not get it, but he would bring it in or send it in the next day; and that Emil repeated this statement a little later, these conversations being a day or so after the note fell due and running along for a month afterwards. Straus is confirmed in his testimony by the fact that on the discount register at the proper place on the line devoted to this note, the word "Paid" was at some time written and was afterwards erased, but that notwithstanding the erasure the outlines of the word can still be seen. Ernest testified that Straus told him he was worried about the note, and that he thereafter questioned Emil and that Emil told him that Straus's note had been taken out of the bank and cancelled and marked "Paid" and put away among Emil's private papers in his private box. Another fact confirms the testimony of Straus on this subject. As already stated, on January 14, 1910, Emil and either Thoma or Ewald went to Straus to get a loan for the Elmhurst Bank. At that time the Elmhurst Bank was seriously embarrassed. Other proof shows that about the same time other officers of the bank borrowed other sums of money from other parties for the bank. The note of Straus was two months and a half past due. Payment on it had not been and never was demanded. If Emil supposed that Straus was liable upon this note, he would naturally have asked Straus for a payment on the note, instead of asking him for a loan. Emil admits that he did not ask him for payment and says he never thought of it. He was cashier. He was anxiously hunting for money, and the fact that he did not even think of asking Straus to pay this note is strong proof that when the note was given it was agreed that Straus should never

be called upon to pay it. Straus testifies that on that day he asked Emil for the note, and that Emil said he forgot to bring it in. Emil does not deny this. It is admitted by all that Straus did not receive any money when he signed and delivered this note, and whether he delivered it direct to Emil, as both Straus and Ernest testify, or whether he handed it to Ernest and Ernest handed it to Emil, as Emil testified, it is clear that Emil was acting as the cashier of the bank and that it was agreed by all of them that Straus should never be called upon to pay the note, but that the others would take care of it, and that its only purpose was to make the books of the bank look better for the time being by causing the name of Ernest, involved in the Crete Bank failure, to temporarily disappear therefrom. There is but one circumstance against this conclusion. When Straus gave this note he took from Ernest a like note of that date for $3,500, which note has never been returned to Ernest. Ernest was afterwards put into involuntary bankruptcy and it does not appear that anything was ever done with this last named note. No one explains why Ernest gave it or Straus took it. Of course, if the bank had sold and endorsed Straus's note to a third party before maturity for value, such purchaser could have enforced the note against Straus as accommodation paper, and we think it a fair conclusion that Straus took this note from Ernest to protect him in case some third party should obtain and enforce the note. But the bank did not transfer the note, and it is the bank and not an innocent holder before maturity that is now prosecuting this cross action against Straus on the note, and the fact that the bank is embarrassed does not alter the legal rights of the parties. Its officer, acting for it and seeking to promote what he conceived to be its interests, took this note with full knowledge that it was given without consideration and upon an express agreement that Straus should never be called upon to pay it.

When Straus gave this note "The Negotiable Instruments Law" of 1907 was in force and the rights of these parties are governed thereby.  Section 16 thereof is as follows:

"§ 16.  Every contract on a negotiable instrument is incomplete and revocable until delivery of the instrument for the purpose of giving effect thereto.  As between immediate parties, and as regards a remote party other than a holder in due course, the delivery, in order to be effectual, must be made either by or under the authority of the party making, drawing, accepting or indorsing, as the case may be; and in such case the delivery may be shown to have been conditional or for a special purpose only, and not for the purpose of transferring the property in the instrument.  But where the instrument is in the hands of a holder in due course, a valid delivery thereof by all parties prior to him so as to make them liable to him, is conclusively presumed.  And where the instrument is no longer in the possession of a party whose signature appears thereon, a valid and intentional delivery by him is presumed until the contrary is proved."

The first sentence of section 58 of said Act is as follows:

"§ 58.  In the hands of any holder other than a holder in due course, a negotiable instrument is subject to the same defenses as if it were non-negotiable."

Garfield National Bank v. Colwell, 10 N. Y. Supp. 864, was a suit upon a promissory note, made by the defendant to the order of Hepworth & Company by an employe of that company, which the defendant signed upon an arrangement with Hepworth & Company that he should incur no liability by signing the note, and the proof was that the defendant took the note, endorsed by Hepworth & Company, to the cashier of the bank, and told the cashier that Hepworth & Company desired to have the note discounted and that he had told the vice-president of the bank that he had been informed by Hepworth & Company that he, the defend-

ant, would incur no liability, and the cashier replied that he so understood it, and the defendant then handed him the note. The defendant received none of the proceeds of the note nor any consideration for its signature. The court said:

"The mere fact that it was accommodation paper would in no way affect the right to recover, because the giving of the note, as an accommodation, if no recovery could be had upon it by the holder of the note, would not be any accommodation to anybody, because nobody could use it. In the case at bar, however, the proofs show a different state of affairs; not only that it was accommodation paper, but also that there was a distinct understanding between the maker of the note and the payee that the maker should incur no liability by the signing of the note. The case of Benton v. Martin, 52 N. Y. 573, and Seymour v. Cowing, 40 N. Y. 532, establish the proposition that a person has the right in the case of an unsealed instrument to impose conditions the observance of which is essential to its validity. This rule is the foundation upon which those cases rest which hold that, where there has been a diversion of the note, unless the holder is a *bona fide* holder without notice he cannot recover. In the case at bar it appears that the plaintiff knew that it was the understanding of the defendant that he should not under any circumstances be liable upon the note. Knowing that this was the agreement between the parties, it is difficult to see how with such knowledge it could acquire the right to enforce that which it knew had been agreed should not be enforced."

Higgins v. Ridgway, 35 N. Y. Supp. 944, was a like action against the maker of a renewal note, where the defendant had received no benefit from the original note or any of its renewals, and the defendant testified that the president of the bank, both when he signed the first note and when he signed the last renewal, told him that he took no risk in signing it and would not be held on the note. The jury found this testimony to be true. The court said:

"The agreement testified to by the defendant, and found by the jury to have been made, was a defense to the note. Bank v. Colwell, 57 Hun 169, 10 N. Y. Supp. 864. There is no distinction, in principle, between the case cited and the one at bar. This note was never delivered by the defendant, nor received by the bank, for the purpose of charging the defendant with liability thereon."

But appellee contends that under the Illinois authorities the note sued upon in the cross action cannot be shown by oral testimony to have been conditional. We are of opinion that the sections of the Negotiable Instruments Law above quoted must be held to change the rule in this State. To require the conditions attaching to the delivery of the note to be shown by documentary evidence would in our judgment entirely defeat the purpose of the sections above quoted. We are of opinion that where the circumstances described in said sections exist, it is the intention of said statute that the actual facts may be shown by oral testimony. It follows that in our opinion the agreement by the cashier of the Elmhurst Bank that Straus should not be held liable upon this note and should not be required to pay it is binding upon the Elmhurst Bank and it cannot recover thereon in violation of the terms of said agreement.

The effect of our decision is to affirm the trial court in allowing the unpaid balance due appellant on the $2,000 loan, and to reverse it as to the set-off allowed to appellee on the $3,500 note; but, as the figures allowed for each are not given in the judgment, we cannot affirm one part and reverse the other, but find it necessary to reverse the entire judgment and to render judgment here for appellant and against appellee for the amount of the unpaid balance due on the $2,000 loan, with interest at 5 per cent per annum, under that provision of section 2 of the Interest Act which allows interest at 5 per cent on money lent by oral contract.

We are authorized to compute the interest under our decision in Ives v. Muhlenburg, 135 Ill. App. 517, and the cases there cited, to which may be added Boyle v. Carter, 24 Ill. 49, City of Chicago v. Wheeler, 25 Ill. 396, and United Workmen v. Zuhlke, 129 Ill. 298. We find due on said oral loan, principal and interest, the sum of $1095.

The judgment is therefore reversed and judgment here for appellant and against appellee for $1095, with execution.

*Reversed and judgment here.*

Finding of facts to be incorporated in the judgment: We find that the Citizens State Bank of Elmhurst, appellee, is indebted to B. F. Straus, appellant, for the balance due upon an oral loan of money in the sum of $1095, and that said Straus is not indebted to said Bank upon the note relied upon in the plea of set-off, because said note was executed by Straus without consideration and was executed by Straus and received by the Bank upon an agreement that Straus should never be called upon to pay the note, and it therefore is not enforceable against him at the hands of the Bank.