DETERMINED IN THE

## FIRST DISTRICT

OF THE

# APPELLATE COURTS OF ILLINOIS

### DURING THE YEAR 1913.

---

## Dean & Son, Limited, Appellee, v. W. B. Conkey Company, Appellant.

### Gen. No. 17,994.

1. CORPORATIONS—*burden of proving corporate existence*. Where defendant pleads *nul tiel corporation*, the burden of proving corporate existence is cast on the plaintiff corporation.

2. CORPORATIONS—*plea of nul tiel corporation*. Where defendant pleads *nul tiel corporation* it is sufficient for plaintiff corporation to prove that it has a *de facto* existence.

3. CORPORATIONS—*when regarded as defacto*. An association may be regarded as a *de facto* corporation, where there is a law authorizing the creation of corporations of its class and powers, and where there is an attempt in good faith to comply with the law.

4. CORPORATIONS—*showing de facto existence*. The introduction of the charter of a corporation with proof of the exercise under it of the franchises and powers thereby granted, is sufficient to establish the existence of a corporation *de facto*.

5. EVIDENCE—*foreign statutes*. By a general rule prevailing in the United States, printed copies of foreign statutes are admissible where shown to the reasonable satisfaction of the court to be authentic.

6. EVIDENCE—*to authenticate foreign statutes*. Where certain books purporting to contain the corporation laws of England are identified as authoritative editions of the statutes by a witness

(162)

Dean & Son v. W. B. Conkey Co., 180 Ill. App. 162.

who testifies he has been a chartered public accountant in England and is familiar with the authoritative editions of the statutes, they are properly admitted in evidence.

7. Evidence—*sufficient to show foreign corporation has de facto existence.* Where plaintiff, claiming to be an English corporation, introduces a certificate of incorporation, the signature of the registrar being attested by a notary public of the City of London and a certified copy of the articles of association there, is sufficient evidence to establish its existence as *de facto* corporation.

8. Corporations—*when contract is not in violation of act relating to foreign corporations.* Where plaintiff, an English corporation, makes a written proposition to defendant in Chicago, which is subsequently accepted by defendant in New York, provided plaintiff agrees to certain changes; and plaintiff's managing director in New York agrees in writing to the modifications and the contract is confirmed, as modified, by the plaintiff in London; the contract is not made in Illinois and plaintiff has not violated the act relating to foreign corporations doing business in Illinois.

9. Account stated—*defined.* An account stated is an agreement between parties who have had previous transactions of a monetary character, that all items of the accounts representing such transactions are true and that the balance struck is correct, together with a promise, express or implied, for the payment of such balance.

10. Account stated—*where court directs verdict.* Where the evidence shows that plaintiff sent defendant several statements of its account, to which defendant made no objection but asked for further time, there is sufficient evidence of an account stated and the court may properly direct a verdict for plaintiff.

11. Account stated—*when question for court.* Where the facts tending to show the statement of an account are undisputed, the question as to whether the transaction amounts to an account stated is for the determination of the court.

12. Appeals and errors—*when error not to instruct jury to include interest in verdict.* Where defendant is indebted to plaintiff for royalties on toy books and for merchandise, and the evidence shows there was an account stated at a certain date, the court in directing a verdict erred in not instructing the jury, as requested by plaintiff, to include interest from the time of the account stated.

13. Appeals and errors—*when court of review will render judgment including interest.* Where the trial court, in directing a verdict on an account stated, errs in not directing the jury to include interest to which plaintiff is entitled, a judgment including interest may be rendered by the Appellate Court.

Appeal from the Municipal Court of Chicago; the Hon. Hosea W. Wells, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1911. Affirmed and modified. Opinion filed April

3, 1913. Rehearing allowed appellee, April 17, 1913. Opinion on rehearing filed May 8, 1913.

**Statement by the Court.** This is an appeal from a judgment for $3,048.53 and costs, rendered in an action of the first class, April 13, 1911, by the Municipal Court of Chicago, in favor of Dean & Son, Limited, a corporation of England, plaintiff below, against W. B. Conkey Company, an Illinois corporation, defendant below. The trial was had before a jury and at the conclusion of all the evidence the court directed the jury to return a verdict for said amount in favor of plaintiff, which they did. Plaintiff requested the court to direct a verdict in its favor for $3,515.79, the difference being interest claimed to be due "from March 16, 1908, the date of the account stated, to the date of trial." The court refused to do this, and plaintiff then moved that the court submit to the jury the question as to whether or not interest should be allowed. This the court also refused to do. The amount of the judgment as rendered is made up of two parts, viz.: $2,590 for certain royalties and $458.53 for merchandise. Defendant claims that plaintiff is not entitled to maintain any action, but, if it can do so, that there is only due plaintiff for royalties the sum of $897.60, and for merchandise the sum of $458.53.

On December 18, 1909, plaintiff filed an amended bill of particulars, in which it was stated that "plaintiff's claim is for royalties accruing and for merchandise, transfers, electrotypes, books, samples, etc., furnished under contract created, modified and construed by letters and cable messages. * * * The account is as follows:

ROYALTIES TO DECEMBER 31, 1907.

| | | | | |
|---|---|---|---|---|
| Mother Goose Series, | 180,000 @ | 1/10¢ | each | $180 |
| Giant Series, | 150,000 " | 1/6¢ | " | 250 |
| Nursery Series, | 120,000 " | 1/5¢ | " | 240 |
| Pinafore Series, | 120,000 " | 1/4¢ | " | 300 |
| Holiday Series, | 96,000 " | 1/3¢ | " | 320 |

| Diploma Series, | 80,000 " 1/2¢ | " | 400 |
| Gold Medal Series, | 120,000 " 3/4¢ | " | 900 |

$2590.

Merchandise (less allowance)                458.53

Total                                    $3048.53

With interest on said sum of $3,048.53 from Feb. 15, 1908. The plaintiff claims the foregoing sum of $3,048.53, upon an account stated between the parties had on or about March 16, 1908.''

On the same day plaintiff, by leave of court, also filed certain additional counts, consisting of a special count and the common counts. Among the common counts was a count "for royalties then and there due and owing" and a count upon an account stated. The special count charged that on or about April 3, 1906, the parties made a contract in writing, which consisted of four letters and which were set out *in haec verba* in the count, and further charged that on May 16, 1906, defendant made a certain selection of books, and requested plaintiff, under said contract, to furnish it transfers for said books so selected, which plaintiff did, whereby defendant became liable to pay plaintiff royalties amounting to $2,590, upon said selection of books for which said transfers were so furnished as provided in said contract. To these additional counts the defendant pleaded (1) general issue, (2) *nul tiel corporation,* and (3) four pleas in varying language to the effect that the action could not be maintained because plaintiff was a foreign corporation, not licensed to do business in Illinois, and had made the contract, and was doing business in Illinois. To the four pleas last mentioned demurrers were sustained by the court. As stated by counsel for defendant in their brief, "it is obvious that the judge directed a verdict for Dean & Son on the theory that there was an account stated.''

Early in March, 1906, H. S. Dean, managing director of plaintiff, had a conversation with W. B. Conkey, president of defendant, relative to the production in the United States by defendant of a certain line of juvenile books published by plaintiff and known as "toy books." As a result of this conversation Dean, on behalf of plaintiff, wrote out and personally delivered to Conkey, in Chicago, a lengthy written proposition, addressed to defendant, by which plaintiff gave defendant "*carte blanche* to produce any of our toy books, and designs contained therein, * * * for sale in the United States" on certain conditions set forth in the proposition. These books were published by plaintiff in certain "Series," as above mentioned in plaintiff's bill of particulars. Each series was in turn subdivided into a large number of books known by certain distinctive titles, such as "Little Mother Hubbard," "The House that Jack Built," "Punch and Judy," "Red Riding Hood," etc. The conditions referred to were, in substance, that plaintiff agreed to supply "transfers" of all and any of the books "selected" by defendant; that "all transfers requested" were to be used by defendant (*i. e.*, the books produced) within twelve months of their being supplied "but in the event of their not being produced within that period, the minimum royalty on that particular class or series of books" was to be paid by defendant and included in the next due account; that defendant was to pay plaintiff certain royalties on all toy books produced by defendant, it being understood that defendant could bind the books in such forms and charge such prices therefor as defendant deemed expedient. It appears from the testimony that a "transfer" is "a technical term for taking an impression from original stones," which impression is afterwards transferred onto zinc or stone from which the books are produced. Paragraph 4 of this written proposition set forth in tabulated form the amount of royalty to be paid "per copy" on the books of each series of which

transfers were selected by defendant, and also the "minimum quantities," measured in thousands, of each book. For instance, in the "Mother Goose" series, the royalty per copy of each book in that series was one-tenth of one cent, and the minimum quantity was "30 M. of each book;" in the "Giant" series, the royalty per copy was one-sixth of one cent, and the minimum quantity "25 M. of each book." Paragraphs 5, 6 and 7 of said written proposition were as follows:

"5. You agree to render us a correct and detailed account of the quantities printed of all Toy Books and Publications produced during any portion of the preceding 12 months, ending the 31st day of December, on the 15th day of February next succeeding in each and every year, and to pay the royalties thereon as already specified on that date, but in rendering the first account, viz.: that for February 15, 1908, it is agreed that the same shall include all the quantities of Toy Books and Publications produced from the date transfers were first supplied by us.   *   *   *

"6. You agree to make every possible endeavor consistent with your business methods to push the sale of the Toy Books and Publications in the United States of America, and in order that there shall be no break in the continuity of the production of the Toy Book line, you agree to take transfers of new, or reprint those already in hand, of not less than twenty titles in each year.

"7. It is further agreed between us that this arrangement shall   *   *   *   be binding   *   *   *   from year to year, but either of us shall be at liberty to terminate the same by a six months' previous notice in writing after February 15, 1908, which notice is to · be given before the 1st day of April in any year.  * * *"

A day or two after the delivery of said proposition, H. S. Dean left for New York, and on March 16th he met W. B. Conkey at the office of the Niagara Lithographic Co. in Buffalo, N. Y., where it was arranged that, if plaintiff's proposal was accepted, the "transfers" were to be sent by plaintiff from London to

said Niagara Co. Both Dean and Conkey then went
to New York City, and, while they were both there,
Mr. Conkey, on behalf of defendant, wrote the follow-
ing letter, dated March 21st, and addressed to plain-
tiff, and caused the same to be delivered to Mr. Dean:

"We hereby accept your proposition of March 12th,
'06 made to us in Chicago with the understanding that
the transfers which you send us will be on zinc plates
and that they will be thoroughly first-class in point of
workmanship; also that the royalty on gold medal
books will be three-quarters cents instead of one cent
per copy. The zinc plates are to be sent f. o. b.
steamer, London, England, we to pay duty and trans-
portation charges you to invoice these zinc plates at
the same prices as you did to Wolf & Company. * * *
We understand that this acknowledgment concludes
an arrangement between us.

Very truly yours,<br>
(Signed)    W. B. CONKEY, Prest.<br>
W. B. CONKEY COMPANY."

To this letter Mr. Dean, while in New York City,
replied on March 23rd, thanking defendant for the
same, "which now places the contract between my
company in London and yours fully in order," and
further saying "I would urge upon you the necessity
of letting us have, with as little delay as possible,
your selection of titles." Mr. Dean returned to Lon-
don, and on April 3rd plaintiff from London wrote
defendant at Chicago, acknowledging receipt of de-
fendant's letter of March 21st, "per our Mr. Dean,
which in conjunction with ours (per Mr. Dean) of the
12th March forms the contract between us, and which
we have much pleasure in confirming." On May 16th,
defendant wrote plaintiff in London, enclosing a list
of 54 titles of books selected by defendant, in accord-
ance with the provisions of the contract, saying "we
enclose list of our selection of titles for various series
for all of which please prepare to send transfers as
rapidly as possible." All of the transfers of the books
selected by defendant were shipped by plaintiff from

London between July, 1906, and March, 1907, and the same were accepted by defendant. On March 1, 1907, plaintiff, hearing rumors of defendant's financial embarrassment, wrote defendant inquiring as to same, to which defendant replied, March 15th, "We have found it necessary to ask an extension from about 30 of our merchandise creditors and banks. * * * This may possibly affect our arrangement with your line." On April 2nd defendant wrote plaintiff saying that they had been negotiating with the Niagara Lithograph Co. with a view to having that company "take over the contract, * * * and proceed at once to publish the books," and requesting plaintiff to cable defendant if such an arrangement would be agreeable to plaintiff, to which plaintiff cabled in reply, "Satisfactory if legally transferred, subject to approval of method and channel of distribution." On May 2nd defendant wrote plaintiff that the Niagara Company had finally decided not to take over the contract, that defendant had been endeavoring to get other concerns to do so but without success, that defendant was willing to release plaintiff from any obligation to defendant, and that plaintiff was at liberty to negotiate with other concerns at once. On May 17th plaintiff wrote defendant in part as follows: "We are in receipt of yours of the 2nd. * * * The clauses and conditions of the contract are undoubtedly familiar to you, and the date of notice and the minimum amount of royalty that will become due to us on the transfers of books supplied. * * * The minimum royalties for period ending December 31, 1907, payable on various transfers supplied up to date (as per enclosed schedule) will amount to $2,590. According to the agreement you cannot give us notice until February 16, 1908, which would not terminate until six months afterwards; this will therefore run the contract into the second year, in which the minimum of twenty titles have to be taken." The sum of $896.80 was then

.stated in the letter as the amount which would be due for royalties for said second year on the basis of the minimum twenty titles, and the additional sum of $676.24 due for merchandise previously furnished, in all the sum of $4,163.04. The letter continued: "On the assumption that you were to determine the contract at the earliest date the liability of your company amounts to $4,163.04, the greater part of which we have long since had to lay out. * * * In order to meet and release you, we will make the following offer, * * * it in no way to prejudice our rights under the contract, viz.: To accept the sum of $3,250 in full settlement of our claim on your company, * * * in two bills of equal amounts at 3 and 6 months respectively,— we to at once have the right to try and place the contract elsewhere, and to have possession of the transfers, blocks, etc., already sent you." The "enclosed schedule," referred to in the letter, was a detailed statement of the 54 titles of the books (previously selected by defendant as above mentioned and for which transfers had been delivered to defendant) and the royalties due on the minimum quantities of each title, as provided in the contract, aggregating the sum of $2,590. On July 12, 1907, defendant replied to plaintiff's letter, *making no objection* to plaintiff's figures as to amount of minimum royalties due for the first year, ending December 31, 1907, and saying in part: "Yours of May 17th, containing full data regarding our arrangement and your suggestions as to settlement, received. We have delayed answering because we wanted to be sure of our position. We now find we are in shape to continue business and expect to be able to handle your line of publications ourselves, and * * * to push line with great effort next year. * * * We think it would be best to let this matter remain just as it is until about November 1st." On July 30th plaintiff wrote defendant to the effect that "the indefinite hanging up until after No-

vember 1st'' of the contract and the production of the toy book line was not agreeable to them, and that they proposed again sending H. S. Dean to the United States and requested defendant to again consider the acceptance of plaintiff's proposition of settlement, as outlined in the letter of May 17th. Defendant replied on August 10th: ''We have given your proposition of May 17th very careful consideration. * * * We deeply regret our inability to have carried out your contract, but financial conditions make it impossible at the present time. * * * We deeply regret that our embarrassment prevents us from making a cash offer of settlement to you.''

Mr. Dean left London and came to Chicago, where he met Mr. Conkey on September 23, 1907, at which time a definite agreement was arrived at as to the amount of money defendant owed plaintiff for merchandise which amount was fixed at $458.53, Mr. Dean on behalf of plaintiff making certain allowances. As to this interview Mr. Dean testified: ''There was some discussion * * * as to how the contract should be carried out. Mr. Conkey said he was anxious to retain the contract, wanted me to leave it with him, but he would require a certain amount of time in which to make payments.'' At the conclusion of the interview Mr. Conkey, on behalf of defendant, wrote and delivered to Mr. Dean a letter, dated September 23rd and addressed to plaintiff, which was at once forwarded by Mr. Dean to plaintiff at London, as follows:

''Confirming conversations with your Mr. H. S. Dean, in regard to our contract with you, we will be pleased to have you leave the contract with us, believing we will be in a position next year to handle your publications along the lines of our contract in a satisfactory manner to both parties. Arranged with your Mr. Dean to settle bill of samples upon basis 50 per cent discount, which is mutually satisfactory and which we will try and settle for before the end of the year.

*Regarding the royalties, we will settle our royalty*

*account with you in full when due,* although we may possibly ask you for time allowance and this settlement will· in no way be taken into account when settling royalties for 1909.''

To this letter plaintiff on October 3rd replied, ''We take pleasure in confirming the arrangement arrived at with our Mr. Dean, as specified in your letter.'' On January 10, 1908, plaintiff wrote defendant inquiring if defendant had ''really started out with the toy books'' and requesting information. Defendant replied on January 27th, saying that, owing to the financial condition then existing in the United States, nothing could be done immediately, and further saying:

''We are not in a position just now *to make a payment along the lines discussed when your Mr. Dean was here* but as soon as matters take a turn will do so.''

On February 26th plaintiff wrote defendant again enclosing a detailed statement of the minimum royalties due for period ending December 31, 1907, viz.: $2,590, and for amount due, less allowance, for merchandise, viz.: $458.53, in all $3,048.53, and saying in part:

''We had hoped   *   *   *   that at least a portion of the amount would have reached us on the due date, viz.: the 15th of the present month.   *   *   *   You intimated in letter September 23rd last *that although settling royalty account in full* you might ask for time allowance and we think therefore that the best method of meeting your wishes is to draw upon you for the amount stated. We therefore enclose you two acceptances each drawn for half amount due, one at 3 months, another at 6 months from February 15th, to which we have added interest at 5% per annum.''

On March 16, 1908, defendant wrote in reply, *making no objection* to the amount mentioned in said detailed statement as due on February 15th, but on the contrary saying:

''We want to ask you if you will divide the payment of this first year's royalty into two years, as you know we have not yet published the books this year, and

have therefore made nothing out of them, and to pay you $3,000 this year would press us very hard.   *   *   * Under the terms of our contract we agree to print not less than 20 titles in one year.  No matter what the outcome of this year's business is we will agree to pay you royalty on 20 titles for this year, so that if you will divide this payment we will send you six months' note for $1,563.37 and next year will pay the balance of your account plus the royalty on 20 titles. Of course if our sales amount to more than the minimum quantity, which we expect they will do, we will pay this also.   *   *   *   If this meets with your approval, we will at once forward you note for $1,563.37 and take hold of this work with vigor."

On March 27th, plaintiff replied to the effect that the best they would do as to dividing the payment of said first year's royalty was that they would accept two notes, one due in 4 months after February 15th, and the other due in 9 months.  On March 31st defendant wrote plaintiff, referring to the provisions of paragraph 7 of the contract and stating: "We are not positive that we want to cancel the agreement, but in order to take advantage of any rights we may have under the agreement, we ask you to accept notice of our termination of the contract before April 1, 1908."  The receipt of this notice was acknowledged by plaintiff by letter dated April 13th.  Defendant on April 27th wrote plaintiff to the effect that they had delayed writing until the receipt of such acknowledgment of said notice, "as this will terminate our business arrangement for the present, and in the settlement we want to have the whole matter cleaned up.   *   *   *   We ask you to accept our 4 and 7 month's notes from this date for $2,000, bearing interest at 5%, we turning over to you the samples and transfers which we have."  On May 12th plaintiff replied to the effect that they were "astonished" at such an "extraordinary proposition" and further ₀ stating, "We must ask you to forthwith return to us the acceptances as drawn, the amount of which you have

already agreed, duly completed, otherwise, there will be nothing left to us but to withdraw the modifications of the agreement, which we have—in our endeavors to assist you—been led to concede." Defendant did not return the notes or "acceptances duly completed," and in the summer of 1908 plaintiff commenced this action, by which it only sought to recover, as disclosed from the amended bill of particulars above set forth, for the royalties claimed to be due for the first year of the contract, ending December 31, 1907, and for the agreed value of certain merchandise, in all amounting to the sum of $3,048.53, together with interest thereon.

On the trial plaintiff introduced evidence to show that it was a corporation. A witness, named Bennington, testified that he had been a chartered public accountant in England, that he had studied law and had passed the necessary examinations on various subjects embracing accounting and commercial law required for such an accountant, that he was familiar with the English law regarding joint stock companies or corporations and with the authoritative editions of the English statutes containing the corporation laws of England. Certain books were handed him which he identified as the authoritative and accepted editions of such statutes. He also identified the form of certificate issued by the registrar of joint stock companies in London, evidencing the incorporation of English companies. Plaintiff introduced in evidence an edition of said statutes, identified by the witness, which purported on its title page to be "The Statutes, Revised Edition Volume, Volume 14, 25th and 26th Victoria to 28th and 29th Victoria, A. D. 1862 to 1865. * * * Printed by George Edward Ayer and William Spottis Woode, printers to the Queen's most excellent Majesty." The statutes contained provisions as to the organization of joint stock companies among which was a provision to the effect that the certificate of the registrar of the incorporation of any company should

be conclusive evidence of that fact. Plaintiff also introduced the certificate of such registrar certifying to the incorporation of "Dean & Son, Limited," the signature of the registrar being attested by a notary public of the city of London under his official seal, and the signature and seal of said notary being attested by the certificate under seal of the Vice-Deputy Consul General of the United States and London, the certificate of the registrar being also attested by said Vice-Deputy Consul General, who certified that to the same "full faith and credit are and ought to be given in judicature and thereout." The certificate of the registrar was to the effect that "Dean & Son, Limited" was incorporated under the Companies Acts, 1862 to 1890, as a limited company on February 24, 1892. The notary certified as to genuineness of the registrar's signature to the latter's certificate and that "by the laws of England such certificate should be conclusive evidence that all requirements of the Companies Acts in respect of registration have been complied with." Plaintiff also introduced in evidence copy of the articles of association of "Dean & Son, Limited," including certain special resolutions of the company, certified to by the assistant registrar as being a true copy of the original document and that he is the legal custodian of the original document. The signature of said assistant registrar was certified to by the Lord Chancellor of Great Britain, dated October 7, 1909, and attested by the great seal of that country. Said articles of association gave to "Dean & Son, Limited," among other powers, the power of doing the business of stationers, printers, engravers, bookbinders, publishers, etc.

NEWMAN, NORTHRUP, LEVINSON & BECKER, for appellant; CHESTER E. CLEVELAND, of counsel.

FELSENTHAL & BECKWITH, FOREMAN, LEVIN & ROBERTSON and HERBERT C. LUST, for appellee.

MR. PRESIDING JUSTICE GRIDLEY delivered the opinion of the court.

It is contended by counsel for defendant that, under the issue formed by defendant's plea of *nul tiel corporation,* plaintiff did not sufficiently prove that it was a corporation, or, to use counsels' language, "did not meet the burden which the law placed upon it." "When this plea is interposed, the burden of proving corporate existence is cast on the plaintiff corporation. But this plea does not impose the burden upon the plaintiff of proving, that it was in all respects a perfectly legal corporation. It is sufficient, for a recovery upon the issue presented by that plea, to make proof that the plaintiff corporation had a *de facto* existence. An association may be regarded as a *de facto* corporation, where there is a law authorizing the creation of corporations of its class and powers, and where there is an attempt in good faith to comply with the law." *Cozzens v. Chicago Brick Co.,* 166 Ill. 213, 215; *Marshall v. Keach,* 227 Ill. 35, 44. "The introduction of the charter of a corporation, with the proof of the exercise under it of the franchises and powers thereby granted, is sufficient to establish the existence of a corporation *de facto.*" *Marshall v. Keach, supra.* But counsel for defendant argue that in this case "there was no sufficient foundation for the introduction of the supposed English statute books in evidence;" that, while it is provided by section 10 of chapter 51 of the statutes of this state that the printed statute books of this state, of the several states and territories, and of the United States, purporting to be printed under authority, shall be evidence, etc., no mention is therein made of the statutes of *foreign* countries; that the supposed English statute books introduced in evidence "did not prove themselves;" that the testimony of the witness Bennington (he being only a chartered public accountant and not an admitted or practicing lawyer), was insufficient properly to prove the authenticity of such books. The

statutes of a foreign country "must be proved as facts, and their existence and validity established by satisfactory evidence. * * * By the general rule prevailing in the United States, printed copies of foreign statutes are admissible where shown to the reasonable satisfaction of the court to be authentic. * * * In some cases the evidence of persons who are neither lawyers nor public officers has been admitted in regard to such portions of the statute law as they have been in a position to become acquainted with." 36 Cyc. 1255. We are of the opinion that in this case the English statute books in question were properly received in evidence. *Jones v. Maffet,* 5 Serg. & R. (Pa.) 523; *American L. I. & T. Co. v. Rosenagle,* 77 Pa. St. 507; *O'Keefe v. U. S.,* 5 Ct. of Cl. 674; *Ennis v. Smith,* 14 How. (U. S.) 400, 429; *Nashua Sav. Bank v. Anglo-American Co.,* 48 C. C. A. 15, 108 Fed. Rep. 764; *U. S. v. Certain Casks of Glass Ware,* 4 Law Rep. 36; *Dawson v. Peterson,* 110 Mich. 431; *Canale v. People,* 177 Ill. 219, 223; *Figge v. Rowlen,* 185 Ill. 234, 238. Counsel further argue that, assuming the statute books "contained genuine Acts of Parliament, there was no competent proof that plaintiff was organized or existed as a corporation under any of such acts." Under the facts as disclosed by this record, we cannot agree with counsel. *Barber v. International Co. of Mexico,* 73 Conn. 587. We think that the evidence sufficiently established plaintiff's existence as a corporation *de facto,* and, hence, the objection, that there was not sufficient proof of plaintiff's corporate existence, is without force. *Cozzens v. Chicago Brick Co., supra.*

It is next contended by counsel for defendant that the action cannot be maintained because plaintiff made the contract in question in Illinois and otherwise transacted business and exercised corporate powers in Illinois, in violation of the provisions of the act relating to foreign corporations. Counsel cite the case of *United Lead Co. v. Reedy Elevator Co.,* 222

Ill. 199. That case is not in point. The plaintiff in this case made and delivered a written proposition to defendant in Chicago. That proposition was subsequently accepted by defendant in *New York* provided plaintiff would agree to certain changes therein. Plaintiff, by its managing director and while the latter was in *New York,* agreed in writing to the modifications, and subsequently plaintiff, in *London,* confirmed in writing the contract as modified. It was not a contract made in Illinois. And we do not think, under the facts of this case and the recent decisions of our Supreme Court, that plaintiff is precluded from maintaining the present action. *Alpena Portland Cement Co. v. Jenkins Co.,* 244 Ill. 354; *Finch v. Zenith Furnace Co.,* 245 Ill. 586; *Lehigh Portland Cement Co. v. McLean,* 245 Ill. 326; *Booz v. Texas & Pacific Ry. Co.,* 250 Ill. 376.

It is further contended by counsel that the trial court erred in directing a verdict for plaintiff at the conclusion of all the evidence, and for the reason that the evidence was such as required the court to submit to the jury, under proper instructions, the question whether or not there was an account stated between the parties. In 1 Am. & Eng. Ency. L. & P., p. 688, it is said:

"An account stated is an agreement between parties who have had previous transactions of a monetary character, that all the items of the accounts representing such transactions are true and that the balance struck is correct, together with a promise, express or implied, for the payment of such balance. * * * (p. 689) In stating an account, as in making any other agreement, the minds of the parties must meet. * * * (p. 693) The meeting of the minds of the parties upon the correctness of an account stated is usually the result of a statement of account by one party and an acquiescence therein by the other. The form of the acquiescence or assent is, however, immaterial, and may be implied from the conduct of the parties and the circumstances of the case. * * *

(p. 699) Where an account is rendered by one party to another and is retained by the latter beyond a reasonable time without objection, this constitutes a recognition by the latter of the correctness of the account and establishes an account stated. * * * (p. 716) An account stated is in the nature of a new promise or undertaking, and raises a new cause of action between the parties. * * * (p. 723) It is deemed conclusive both at law and in equity unless impeached for mistakes or fraud. * * * (p. 725) The defense to an action upon an account stated must relate *to it* and not to matters of anterior liability, except in so far as they constitute a foundation for the introduction of evidence to the real substantial defense impeaching the *settlement* for fraud, error, or mistake. * * * (p. 731) The burden of proof is upon the party seeking to open an account stated for fraud, or to surcharge or falsify such an account on the ground of omission or mistake. * * * The fraud or mistake must be clearly shown. * * * (p. 723) Where the facts tending to show the statement of account are undisputed, the question as to whether the transaction amounts to an account stated is for the determination of the court, as where the entire evidence consists of correspondence.''

The law, as stated in the text book referred to relative to accounts stated, we believe to be the law of this state. In *State v. Illinois Cent. R. Co.*, 246 Ill. 188, page 241, it is said:

''A stated account is an acknowledgment of an existing condition of liability of the parties, from which the law implies a promise to pay the balance thus acknowledged to be due. * * * It may be impeached for fraud or mistake. The general rule is, that in an application to open a stated account the plaintiff must either charge fraud or state particular errors. * * * (p. 242) 'A person seeking to open a settled account must specify in his claim either errors of considerable extent, both in number and amount, or at least one important error of a fraudulent nature.' * * * (p. 243) The authorities seem to be a unit in holding that mistakes or errors must

be specifically alleged and proved.  *  *  *  (p. 246)
In ordinary business transactions, if an account has
been transmitted from one individual to another it
will be deemed a stated account from the presumed
approbation or acquiescence of the parties, unless an
objection is made thereto within a reasonable time.
*  *  *  When the facts are undisputed the question
is for the court, but when the facts are in dispute in a
common law action the question should be submitted
to the jury under proper instructions." See also
*Northwestern Fuel Co. v. Western Fuel Co.,* 144 Ill.
App. 92; *Wurlitzer Co. v. Dickinson,* 153 Ill. App. 36;
*Pickham v. Illinois, I. & M. Ry. Co.,* 153 Ill. App. 281.

In *Dick v. Zimmerman,* 207 Ill. 636, 639, it is said:

"In an action upon an account stated, the original
form or evidence of the debt is unimportant, for the
stating of the account changes the character of the
cause of action, and is in the nature of a new under-
taking. The action is founded, not upon the original
contract, but upon the promise to pay the balance
ascertained."

We are of the opinion that the evidence in this case
clearly showed that at least as early as March 16, 1908,
the defendant was indebted to plaintiff upon an ac-
count stated in the sum of $3,048.53, that there was no
evidence tending to impeach the settlement for fraud
or mistake, and that, under the facts of this case, and
under the law, the court rightly directed a verdict for
plaintiff. As shown by plaintiff's amended bill of
particulars, the amount of plaintiff's claim, $3,048.53,
was made up of two principal items, viz.: $2,590 for
royalties for period ending December 31, 1907, and
$458.53 for certain merchandise (less allowance). On
May 17, 1907, plaintiff by letter rendered a detailed
account to defendant showing that the amount, which
would be due and payable plaintiff under the pro-
visions of the contract on February 15, 1908, for
minimum royalties for the period ending December
31, 1907, was $2,590, and claiming that $676.24 was due
plaintiff for merchandise previously furnished defend-

ant. On July 12th defendant acknowledged receipt of plaintiff's letter, but made no objections to plaintiff's figures as to amount stated to be due for merchandise or for said royalties to become due. On September 23rd, when Mr. Dean met Mr. Conkey, president of defendant, in Chicago, the latter raised certain objections to the amount claimed for merchandise, and a definite amount was then fixed, viz.: $458.53, as the amount due plaintiff for said merchandise. Mr. Conkey made no objections at that time as to the amount plaintiff claimed would be due for royalties on February 15, 1908, viz.: $2,590, but on the contrary he, on behalf of defendant, on said September 23, 1907, wrote plaintiff: "We will settle our royalty account with you in full when due, although we may possibly ask you for time allowance." On February 26, 1908, plaintiff again rendered a detailed statement of the amount for minimum royalties, $2,590, due on February 15th, for the period ending December 31, 1907, and of the amount, $458.53, due for merchandise as agreed. On March 16, 1908, defendant acknowledged receipt of this detailed statement, made no objections to the total amount claimed to be due, $3,048.53, but on the contrary admitted the correctness of the amount by requesting plaintiff, on account of defendant's financial troubles, to "divide the *payment* of this first year's royalty into two years," and suggesting that defendant be allowed to send a six months note for half of the amount and to pay the balance "next year." Plaintiff replied to the effect that the best they would do, as to extending the payment of the amount due, was the acceptance of a 4 months' note for half of the amount and a 9 months' note for the other half. The defendant did not accept this proposed extension of payment of the amount due, but, by letter dated May 12th, made an entirely new proposition of *settlement*, suggesting the payment of a less amount than had previously been agreed to, *and* the return to plaintiff

of the samples and transfers then in the possession of defendant, which proposition plaintiff refused to consider. Counsel for defendant argue that this latter correspondence shows that the minds of the parties did not meet as to the amount due. To this we cannot agree. It is clear that the minds of the parties met on March 16, 1908, as to *amount due* from defendant to plaintiff. The defendant then asked for more time within which to *pay* that amount than plaintiff was willing to grant. The defendant then proposed a different settlement than that previously agreed to by the parties, but plaintiff refused the proposition.

There was some testimony introduced by defendant tending to show want or failure of consideration for defendant's promise to pay the royalties stipulated for in the original contract, but counsel for defendant state in their printed reply brief that this testimony was only "pertinent to the supposed cause of action upon the original contract and was not pertinent to the supposed cause of action upon the account stated." We agree with this statement and also the further statement of counsel that "it is obvious that the judge directed a verdict on the theory that there was an account stated." This being so, the said testimony was not proper for a jury's consideration on the issue as to an account stated.

Counsel for plaintiff have assigned cross errors to the effect that the trial court erred "in refusing to instruct the jury to include in its verdict interest at 5% per annum on $3,048.53 from March 16, 1908, to the day on which the verdict was rendered." Such assignment presents the question for our consideration. *Dickson v. Chicago, B. & Q. R. Co.*, 81 Ill. 215; *Street v. Thompson*, 229 Ill. 613, 620. Plaintiff asks that the judgment be reversed on this account, and that this court enter judgment for the above mentioned amount, plus interest thereon at the above mentioned rate from said March 16, 1908, or that this court remand the cause with directions to the Municipal Court to enter

a judgment in such amount. Section 2 of chapter 74 of our statutes provides: "Creditors shall be allowed to receive at the rate of five (5) per centum per annum * * * on money due on the settlement of account from the day of liquidating accounts between the parties and ascertaining the balance." See *Hartshorn v. Byrne,* 147 Ill. 418; *Luetgert v. Volker,* 153 Ill. 385, 390. On the trial, plaintiff introduced evidence showing that interest on the sum of $3,048.53, at five per cent. per annum, from March 16, 1908, to the day of the trial amounted to $467.26. As before stated, we are of the opinion that the trial court, at the conclusion of all the evidence, properly directed a verdict for the plaintiff for said principal sum of $3,048.53, and if plaintiff had not assigned cross errors we would affirm the judgment. We are also of the opinion, however, that the court, in its instruction to the jury, should have gone further and directed the jury to assess plaintiff's damages at said principal sum plus the proper interest. "In some jurisdictions the court will increase the amount of a judgment where it is for a less sum than the undisputed evidence shows plaintiff to be entitled to,—as, for instance, where there is an obvious error in regard to the allowance of interest." 3 Cyc. 439. Had this case been tried by the court without a jury we could, under the authority of several Illinois decisions, enter judgment in this court against the defendant for said principal sum including interest. *United Workmen v. Zuhlke,* 129 Ill. 298, 307; *Manistee Lumber Co. v. Union Nat. Bank,* 143 Ill. 490, 504; *City of Chicago v. Wheeler,* 25 Ill. 478, 482; *Ives v. Muhlenburg,* 135 Ill. App. 517, 524; *Straus v. Citizens' State Bank,* 164 Ill. App. 420, 431, affirmed 254 Ill. 185. In the *Zuhlke* case, *supra,* Florentina Zuhlke brought suit in *assumpsit* upon a beneficiary certificate issued to her husband during his lifetime, which provided that at his death the sum of $2,000 should be paid to her. The cause was tried before the court without a jury, resulting in a finding

and judgment in her favor for $2,000, without interest, which judgment was affirmed by the Appellate Court (30 Ill. App. 98). On the appeal of the society to the Supreme Court, she assigned as cross-error that she was allowed no interest. It was in evidence that on October 24, 1884, she gave the society written notice of her husband's death on October 15, 1884, and made written demand for the payment of the $2,000. The Supreme Court said (p. 307) : ''We know of no reason why she is not entitled to interest from the date of such notice at the rate òf six per cent. per annum. * * * The judgments of the Circuit and Appellate Courts are correct as far as they go, but they should have allowed interest. The interest on $2,000 at the above rate from October 24, 1884, to the present term of this court is $553.33. Judgment is therefore hereby rendered in this court in favor of the appellee for $2,553.33.'' In *City of Chicago v. Wheeler, supra,* actions in *assumpsit* were commenced by appellees to recover the damages, as awarded by commissioners, which appellees had sustained by the appropriation of their real estate to the use of the city of Chicago in the extension of La Salle street. The suits were tried before the court without a jury, resulting in judgments for appellees. In the Supreme Court they assigned as cross error that the court should have allowed interest on the amount of damages awarded them by the assessment. The Supreme Court held that interest was allowable under the statute upon money withheld by an unreasonable or vexatious delay in payment; that when appellee's property, which had been condemned for a street, became the property of the city for the public use the city owed appellees the amount of the damages awarded, which it was bound to pay within a reasonable time; that a delay of more than two years in making such payment was unreasonable; and that the trial court erred in not allowing interest to appellees from June 9, 1858, that date being two years

after the confirmation of the commissioners' report. And the court said (p. 482): "We shall reverse the judgments below, and as the amount which these appellees are entitled to receive, depends upon computation only, we shall render the proper judgments here." The court then stated what they found the proper amounts to be after making the computations, and entered judgments in those amounts against the city.

But counsel for defendant contend that, even though this court would have the power, had the present case been tried before the court without a jury, here to enter judgment in favor of the plaintiff for said amount of $3,048.53, plus interest at the rate of five per cent. per annum from March 16, 1908, we have no power so to do, or to remand the cause with directions to the trial court to enter a judgment including said interest, where the cause was tried by a jury; that in such a case, where the judgment of the trial court is reversed for an error of law, this court can only remand the cause for a new trial. In support of their contention counsel cite, among others, the cases of *City of Spring Valley v. Spring Valley Coal Co.*, 173 Ill. 497, 506; *Thomas v. Wightman*, 129 Ill. App. 305, 307; *Clarke v. Supreme Lodge*, 189 Ill. 639; *Osgood v. Skinner*, 186 Ill. 491; *Kanawha Dispatch v. Fish*, 219 Ill. 236, 240; *Rigdon v. More*, 242 Ill. 256. In our original opinion, filed April 3, 1913, we took this view of the question and reversed the judgment and remanded the cause for further proceedings. Plaintiff filed a petition for a rehearing which was allowed. After further consideration we have reached the conclusion that the judgment of the trial court should be affirmed but modified, and that judgment for the plaintiff be entered here for said sum plus interest. In *People v. Board of Supervisors*, 125 Ill. 9, at page 21, it is said:

"The mere ascertaining of an amount by the multiplication, addition or subtraction of given numbers,

presents no question of fact for a jury. In such cases there can be but one result, and the court may either itself perform the labor of ascertaining it, or intrust that labor to any competent individual. In legal presumption, the court knows what is the result. It is upon this principle, that where an action is brought for a sum certain, or which may be made certain by computation, the court can enter judgment for the plaintiff for the amount of his damages, without a writ of inquiry. 2 William's Saunders, 107a, notes b, c; *Renner v. Marshall,* 1 Wheat. 215, 216; *Rust v. Frothingham,* Breese, 331."

In *Wilmans v. Bank of Illinois,* 6 Ill. (1 Gilm.) 667, an action in debt was brought by the bank upon a note for money loaned. The defendants filed four pleas, all in substance denying the corporate existence of the bank, to which pleas a general demurrer was sustained and a judgment was rendered on the demurrer for an aggregate sum, including the debt, interest and damages, without distinguishing the amount of either. The Supreme Court held that for this reason the judgment should be reversed. The court further said (p. 671):

"But as we can ascertain in this case, what judgment ought to have been rendered by the court below, it is competent for this court to enter that judgment here, without subjecting the party to the expense of remanding the case for that purpose."

In *Pearsons v. Bailey,* 2 Ill. (1 Scam.) 507, an action in *assumpsit* was commenced by Bailey, surveyor for Cook county, to recover of the defendants the sum of $112 for money paid to chainmen and the sum of $420 for surveying and platting town lots in the town of Canal Port. The cause was tried before a jury and a verdict and judgment rendered in favor of Bailey for $532. During the trial the defendants asked the court to instruct the jury that under the statutes Bailey could not recover for money paid to chainmen, which instruction was refused. The Supreme Court said (p. 511):

"From this construction of these statutes, it results, that the court below decided erroneously, in refusing the instruction asked; and for this reason, the judgment below is reversed with costs. But as the bill of exceptions enables this court to ascertain the sum that would have been recovered, if the instructions had been given, it is unnecessary to send this case back for a new trial. Judgment is accordingly rendered in this court for $420; for which sum and the costs of the court below, Bailey is entitled to an execution.''

In the present case, as stated by counsel for defendant in their brief, "it is obvious that the judge directed a verdict for Dean & Son on the theory that there was an account stated," and, as above stated, we think that the evidence clearly showed that at least as early as March 16, 1908, the defendant was indebted to plaintiff upon an account stated in the sum of $3,048.53, and that the trial court rightly directed a verdict for the plaintiff on that theory. This being so, under section 2 of chapter 74 of our statutes above referred to, plaintiff was entitled to interest from said date on said sum at the rate of five per cent. per annum, and the trial court erred in refusing to instruct the jury accordingly. Inasmuch as the amount of interest on said sum from said date to the present date can be easily computed, no reason is perceived why, under the facts of this case, we should not here enter a judgment including such interest, as was done in *United Workmen v. Zuhlke, supra*. We do not think that the fact that the present case was tried by a jury prevents our so doing. The trial court should have instructed the jury to include the interest in their verdict, and the court erred in not so doing when requested by plaintiff's counsel at the conclusion of all the evidence. Had this been done a judgment in the proper amount would have been entered. "The right of a trial court to direct a verdict is one of the incidents of a trial by jury." *City of Spring Valley*

*v. Spring Valley Coal Co.*, 173 Ill. 497, 507. The interest on the sum of $3,048.53, at the rate of five per cent. per annum, from March 16, 1908, to the present date, May 8, 1913, amounts to $784.08. Judgment is therefore hereby rendered in this court against W. B. Conkey Company, appellant, in favor of appellee, Dean & Son, Limited, for $3,832.61.

*Judgment affirmed and modified.*