State Bank of West Pullman, Appellee, v. Gregory H. Hovnanian, Appellant.

Gen. No. 32,435.

Opinion filed October 3, 1928.

JOHN T. RICHARDS, for appellant.

KIRKLAND, FLEMING, GREEN & MARTIN, for appellee; WEYMOUTH KIRKLAND, JOSEPH B. FLEMING and JAY FRED REEVE, of counsel.

MR. JUSTICE TAYLOR delivered the opinion of the court.

On January 28, 1926, the State Bank of Pullman, as plaintiff, brought suit in assumpsit against Gregory H. Hovnanian in the circuit court to recover the amount of principal and interest claimed to be due from the defendant to the plaintiff on a promissory note, payable on demand, for the principal sum of $3,200. A declaration, containing the consolidated common counts and a count in the usual form on the note in question, payable to the order of the bank, was filed by the plaintiff. The defendant filed five pleas: One of the general

issue, one alleging want of consideration, one alleging that the note was made for the accommodation of the bank, one alleging that the note was made and delivered to the plaintiff on condition that it should not be a lawful obligation unless or until the note or the proceeds thereof should be required by plaintiff for use in payment of the depositors of the plaintiff bank in the event of a run on the bank, and that when plaintiff bank should become able to meet the demands of its depositors the note should be returned to the defendant without payment, one alleging that the note was given into the possession of the plaintiff by defendant upon and in consideration of the promise and agreement of the plaintiff with the defendant that defendant would not be required to pay the same unless, by reason of a run on plaintiff's bank, it should become necessary to require payment thereof in order to enable plaintiff to pay its depositors and that when the emergency passed without a run on the bank that the note should be returned to the defendant without payment of any part thereof; that the emergency has passed and that no run occurred after said note was delivered into the possession of the plaintiff.

A trial was had, before the court with a jury, and a verdict rendered on October 1, 1927, in favor of the plaintiff in the sum of $3,670. On October 8, 1927, judgment was entered in accord with the verdict. This is an appeal by the defendant therefrom.

1. The evidence shows substantially the following: In the fall of 1921, the defendant was a director and vice president of the plaintiff, the State Bank of West Pullman (hereinafter called the Bank). A former cashier of the Bank, one Olson, had permitted, and, temporarily concealed from the knowledge of the directors, an overdraft by a depositor in the sum of, approximately, $55,000, for which the depositor, after making the overdraft, gave the Bank, approximately, $45,000 in amount, of uncollectible and worthless paper. The

effect of the overdraft was an impairment of the capital stock to that extent. Shortly after that, one Tholen, in April, 1921, was made cashier in place of Olson. Tholen testified that he first found out about the $45,000 of worthless notes, and, accordingly, told the defendant about them. Owing, also, to the fact that there had been recent heavy withdrawals by some foreigners who drew their money to send to the old country, the Bank's affairs did not look well.

Tholen testified that the defendant was concerned about the matter and asked him if an interview with the bank examiner could be arranged so that certain notes that were doubtful, and, also, the $45,000 of fictitious notes, could be sold.

Counsel for the defendant in his brief states that ''A short time previous to this a run on the bank had been impending.'' The defendant requested Tholen to arrange an appointment for him with the bank examiner. At that time the latter had made no complaint. A conference was held at the office of the bank examiner, Savage, at which all the directors and Tholen were present. At that conference Savage—who was State auditor of public accounts—told them that in case of a run on the Bank, it would not be able to meet the demands of its depositors and that they should do something for the protection of the depositors. Tholen testified that Savage called the attention of the directors to the notes in question and said he wanted them removed from the *assets* of the bank, and the question arose as to how they could be removed; that one of the directors—he thought it was the defendant—made the proposal that they, the directors give their individual notes for the notes in question; that Savage said that would be satisfactory to him, provided they would furnish him with a statement that their individual responsibility was satisfactory; that it would then be satisfactory to have the directors' notes put in place of the notes in question; that then the question was

asked as to how the directors were to recover those notes when the Bank was in a position to reimburse the directors for the amount of the notes; that Savage said that was not a question for the State department to answer, that it was entirely one for the directors themselves; that if at some time in the near future the earnings of the Bank were sufficient to reimburse the directors, the State department had no objection to offer to that; that it was stated at the meeting that the purpose of the notes was to make good an impairment of the capital stock, which impairment was apparent at the time, and that no definite time was stated in which the notes were to be returned.

It is the evidence of Savage, "Examiner in Charge," that there was a conference at his office about December 31, 1921; that those present, who were directors, were unanimous in the opinion that an assessment of capital stock on the stockholders would probably cause dissatisfaction and precipitate a run on the Bank; that it then became a matter of putting in cash or acceptable securities in place of those that were worthless; that it was agreed that the notes (the ones to be put in by the directors) were to be drawn up at the Bank, and the auditor's office notified when they were put into the assets of the Bank, and the worthless assets removed; that the only knowledge he had as to whether or not the notes were carried as assets of the Bank was acquired through subsequent examiners' reports and the statement of the cashier that they were there, and put into the assets of the Bank and the worthless assets removed; that he made no "deal" of any kind with the directors about their taking out their notes; that he could not have done so and carried out the purpose of putting them in; that it was stated at the meeting that the purpose of the notes was not merely to give the Bank the appearance of a solid front, but bring it about in reality; that there was something said about the final disposition of the notes, and whether the makers would

ever be reimbursed for putting them in; that he told them that that could not be, but that the stockholders, subsequently, if they wanted to, and they only, could reimburse them out of the assets of the Bank; that the directors themselves could not do it. He testified that putting in the notes of the men composing the directorate prevented a run on the Bank and prevented an assessment. Pursuant to the understanding reached among themselves by the persons constituting the directors of the Bank, demand notes were made out and executed and delivered by each of them (except Tholen) to the Bank. Each note was for such a part of the $45,000 as the ratio between each director's amount of capital stock and the whole (exclusive of Tholen). They were demand notes, and when later it was discovered by the bank examiner that they did not draw interest, new notes, drawing interest, were made out, signed and delivered to the Bank. The original note of the defendant was for $3,000. Subsequently, another note for $3,200 was put in its place, a mistake having been made in the computation of some one or more of the original notes. (The note sued upon and which was offered in evidence, does not appear in the Abstract of Record as an exhibit.) According to the testimony of Fiddelke, cashier of the Bank, the note sued upon was a renewal note, being the third that was given.

It is the evidence of Cockrell, of the Continental and Commercial National Bank, who had charge of the Bank and said he was as familiar with the Bank's present financial condition as anyone could be, and who was called by the defendant, that he could not state its condition at the time (when he was testifying) in a few words, there were too many worthless assets still undetermined; that he had occasion to examine the affairs of the Bank and it was not in a sound financial condition as he would term it as a banker; that the last statement to the State auditor showed a capital stock of $200,000, surplus of $40,000, and undivided profits of $10,000 to

$15,000; that on the other side of the ledger these notes are shown that are being here contested, in the sum of $30,000, which if not good, would have to be taken out of the above figures as to capital, surplus and undivided profits; that the Bank is merely in a progressive state.

Besides Cockrell and Tholen, called for the defendant, there was called on his behalf, Murphy and Sykes, two of the Bank's directors, and he, the defendant, testified himself. The evidence of Murphy is that he was present at the meeting with Savage; that they concluded that they, the directors would put in their individual notes in an amount to satisfy the State auditor's office, so that in the event of a run on the Bank the depositors would be protected; that there was nothing said about whether they should or should not be paid; that that was subsequently submitted to Savage, and something was said in relation to the notes being returned to the directors; that Savage said that was not a matter for the State department, that it was a matter to be decided among the directors; that after that, an informal or special meeting was called and the notes were drawn up and signed; that no minutes were kept of the meeting. On cross-examination, he testified that nothing was said about the notes being carried as assets of the Bank at the time they were given. The evidence of Sykes describes the conference with Savage. He testified that the question came up as to how the notes were to be returned in the event that there was or was not a run on the Bank; that Savage said he had no jurisdiction over that, as it was a matter to be decided among the directors; that when the Bank was on its feet the banking department was not interested in that matter. He further testified that Tholen and the directors said that the notes were simply to be placed in the Bank on a guarantee to the depositors, as an additional asset, and when the protection became unnecessary, and was not needed, the notes were to be

returned. Whether the State auditor considered the notes still necessary, he stated that he did not know. In his opinion the Bank was, at the time of the trial, sound. On cross-examination, he testified that the purpose of putting up the notes was to put them in the assets and carry them as assets of the Bank; that at the conference the main part of the discussion was the protection of the depositors, and the fear that there might be a run on the Bank; that it was his and the directors' understanding that the notes when put in were to be shown in the financial statements of the bank examiner, and so be shown to other banks, the public, to creditors, stockholders, and everybody, as assets of the Bank; that he knows of nothing in the minutes, or in writing, letter or otherwise, that shows that there was any qualification or condition to the notes.

The evidence of the defendant as to the conference is that he told Savage, at the conference, in the presence of the other directors, that he would be willing to give his note for his share of the loss ''for the protection of the depositors in case of a run on the Bank, with the understanding that I will not be obliged to pay the note unless there is a run on the bank and the bank needs that money to pay the depositors, and, also, as soon as the bank can do without my note, it should be returned to me''; that after some further talk the other directors said they would do the same; that Savage said his department could make no agreement as to drawing their notes out, that they could put their notes in and whatever agreement they made among themselves would be satisfactory to the department; that after that, about two or three weeks, they agreed among themselves that they would put up their notes for $45,000 for the protection of the depositors in case of a run on the Bank, and the Bank needed the money to pay the depositors, and that their notes would be returned to them as soon as the Bank could do without

the notes; that the agreement was made between them and Tholen, the cashier; that Tholen was acting for the Bank; that at the meeting on December 31, 1923, there were present, besides himself, Cole (the president) and Sykes, Murphy, Lewis and Tholen; that Tholen acted as secretary, but no minutes were kept; that the notes were made out by Tholen; that his, the defendant's, was for $3,000; that five or six months later, as the original notes were not made to draw interest, at the request of the bank examiner, who said the notes must be kept good and collectible, new notes were made out because the first ones did not provide for interest; that again another change was made because of an erroneous computation as to the note of one of the directors and his, the defendant's, note was finally made out for $3,200; that when made into a $3,200 note, it was changed to a collateral note; that he asked Tholen what that meant, and he said, "This is simply for my convenience in bookkeeping, but has nothing to do with you"; that he, the defendant, never saw the collateral mentioned in the note; that he saw the phrase, "Various notes as per list attached" in the note when he signed it; that the notes as per list attached were not taken out and turned over to the directors; that Tholen acted as secretary of the meeting and kept the minutes, but nothing was put in the minute book concerning the transaction because they were afraid it might leak out; that none of the $45,000 of worthless notes were delivered to him; that he had a personal account with the Bank on December 31, 1921, when his original $3,000 note was given, but did not know anything about whether his account was credited with the sum of $3,000 being the proceeds of that note; that he did not deposit $3,000 in that account that he remembered, and when shown a sheet from the bank ledger purporting to show his account with the Bank, he stated in relation to an item of $3,000 under date of December 31, 1921, showing a deposit of that amount

on one side and debit of that amount on the other on the same day, that those transactions did not change the balance at all; that he did not remember anything about any such transaction; that they were not to take the place of or replace the $45,000 of worthless notes; that he did not know that the worthless notes were supposed to be taken out of the assets of the Bank; that their notes were not put in place of them; that when he signed his note, he saw the phrase, "Various notes as per list attached"; that those notes were not taken out and turned over to the directors; that he did not see any notes, or a list of such, attached, and when he asked Tholen, the cashier, what that meant, he said it was for his own convenience in bookkeeping; that on the renewal note of December 3, 1923, the one here sued on, he has paid interest for February, March and April, 1924; that at the time he gave his note he owned 20 shares of bank stock, but has since sold it.

The evidence further discloses that some time after the spring of 1922, pursuant to a statement of the State auditor, a certain list of notes in the Bank amounting to $40,000, was in his judgment worthless and that he wanted them taken out; that the directors, accordingly, put in $40,000 in cash and took over the notes.

Later, in 1923, there was another transaction pertaining to $146,757.84 of objectionable paper which the auditor required the Bank to get rid of. In that case a syndicate was formed, and certain of the directors purchased from the Bank the $146,757.84 of securities, and paid into the Bank therefor the sum of $125,000. The members of the syndicate entered into a written trust agreement dated May 11, 1923. The parties to that agreement were the Bank, three trustees, and certain directors and stockholders. The syndicate agreement was offered in evidence by the plaintiff, but was ruled out by the learned trial judge; although it showed on its face that one of the notes taken out as bad was that of one Cole for $13,000, which had been given by him

at the time the defendant gave his note as part of the $45,000. The evidence shows that, at the time of the trial, for the benefit of the subscribers, 30 to 40 per cent of the $146,757.84 had been collected.

As to the condition of the Bank at the time of the trial, Sykes, a director, stated that its financial standing was good, its condition sound. Cockrell testified that he was familiar with the then financial condition of the Bank; that it had too many worthless assets, which were still undetermined; that there were too many contingencies to permit him to state its condition in a few words; that he had occasion to examine its affairs and that it was not in his judgment as a banker in a sound financial condition; that the last statement to the State auditor showed a capital stock of $200,000, a surplus of $40,000, and undivided profits of $10,000 to $15,000; that that statement showed on the other side of the ledger these notes now being contested in the sum of $30,000, and if they are not good they would have to be taken out of the above figures of capital stock, surplus and undivided profits; that he told the attorney for the defendant that he considered the Bank insolvent when he took hold of it; that if he is permitted to continue his services long enough he thought it would become an A1 institution; that it is in a progressive state.

2. It is claimed for the defendant that (a) as between the Bank and the defendant there was no consideration for his note; (b) that it was given for the accommodation of the Bank; (c) that evidence of the condition upon which the note was delivered was admissible; (d) that the agreement between the directors and the cashier of the Bank was valid and binding on the Bank; (e) that it was shown by uncontradicted evidence that the note sued upon was delivered upon conditions which were not satisfied.

(a and b) As to consideration and accommodation. In the view we take of the case, no such questions properly arise. The Bank did not request accommodation.

It was static in the matter. The directors, not as directors, but as individuals, voluntarily, for reasons and interests of their own, put into the assets of the Bank, to become part of the liquid assets of the Bank, that is without conditions, either precedent or subsequent, their personal demand notes, on which interest at once began to accrue.

The Bank did not borrow temporary, qualified credit. The Bank received, to comply with the law as involved in the rigid requirements of the bank examiner, liquid assets in the form of complete unconditional property rights. It was given certain notes by certain individuals which on their face evidenced without qualification promises to pay certain sums, with interest, on demand. Appropriate entries were then made in the books of the Bank showing that it owned those notes and that they, without condition, constituted part of its assets. As far as the Bank was concerned, it was in the nature of a gift, save that the individual makers of the notes took over, as Tholen's testimony and the bookkeeping showed, the worthless paper that had caused the trouble. When the defendant was shown a sheet from the ledger of the Bank, purporting to show his account, he stated in relation to an item of $3,000 under date of December 31, 1921, the date of his original note, which showed a deposit of that amount on one side and a debit of that amount on the other on the same day, that those transactions did not change the balance at all, and that he did not remember anything about any such transaction. Tholen testified that the defendant's account was credited with $3,000, and a check for $3,000 was drawn against it, which the defendant signed, and that it was thus wiped out; that one entry offsets the other; that he drew up the check and had the defendant sign it; that the whole affair was a form of bookkeeping and was not a cash transaction. That evidence tends strongly to show that the Bank got the note outright as his unqualified obligation, as on its face it

states, and was such as to creditors, prospective depositors, the State banking authorities, and the Bank itself. Such being the facts, no question, as we have said, as to consideration or accommodation arises. But even if such a question did arise, in our opinion the evidence does not show that the Bank made any promise to receive the notes subject to any resolution of any kind by the Bank. The evidence of Tholen justifies the conclusion that by no legal act did the Bank authorize the receipt of the defendant's note with a condition attached.

The defendant knew that he could not put his note in with a condition attached. He admits the bank examiner told him so. It is true the bank examiner told him that among themselves, meaning, necessarily as individuals, that they could agree as they liked, but not with the Bank. They may have agreed among themselves as individuals that they would put in their notes with certain conditions attached, but that would not bind the Bank, which was not a party to it. This is a suit at law and not in equity, and they certainly have no defense, to a suit by the Bank, on the ground of want of consideration, or that they were accommodation notes.

It may be said, further, on the subject of consideration, that even if one were necessary, we think that bringing about the solvency of the Bank and the consequent expected "release from liability from an assessment on his stock was a valid consideration." *Liberty Trust Co. v. Price,* 259 Mass. 596, 156 N. E. 749; *Farmers' Equity Co-Op. Ass'n of Dresden v. Tice,* 122 Kan. 127, 251 Pac. 421; *Queensboro Nat. Bank of City of New York v. Kelly,* 220 App. Div. 515, 221 N. Y. Supp. 703. In the latter case the court said:

"The contention that this note was without consideration cannot prevail. The vital interest which this appellant, as principal stockholder, director and

president of the bank, had in its success or continuance in business was in and of itself a sufficient consideration for the giving of his note for a one-twenty-first proportion of the total of the bank's impaired assets. It is apparent from the defendant's testimony that the ruling of the federal bank examiner was that these 'doubtful assets' or 'losses' could not be carried as bank assets. Moreover, the testimony expressly shows that these directors 'would take up the losses, with the distinct understanding that they would be reimbursed either from one or two sources; that is, liquidation of the bad accounts or from other resources of the bank or earnings as they came in.' It was the clear intention of all of the makers that their notes were to be looked upon by the bank's depositors as well as the public as live and liquid funds, and that these note makers were to be regarded as creditors of the bank out of specific sources, namely, when the 'bad accounts' were liquidated or the resources or earnings of the bank would permit of reimbursement. The notes were not only good but were based upon a fair legal consideration.

"Moreover, I think that, under well-settled authority, this arrangement of the directors, assuming it to have been made and further assuming it to be entitled to the dignity of being called as agreement, was illegal." *Whiteman v. Bishop,* — Tex. Civ. App. —, 289 S. W. 730; *First Nat. Bank v. Henry* (Kan. App.), 202 S. W. 281.

In our judgment, *Higgins v. Ridgway,* 90 Hun. 398, 35 N. Y. Supp. 944; *Garfield Nat. Bank v. Colwell,* 57 Hun (N. Y.) 169; *Straus v. Citizens State Bank of Elmhurst,* 164 Ill. App. 420, and *Ruvenacht v. German-American Bank of Gridley, Illinois,* 212 Ill. App. 68, are quite distinguishable from the instant case.

(c) Was evidence admissible that the note was given on condition? Section 16 of the Negotiable Instru-

ments Law, Cahill's St. ch. 98, ¶ 36, provides as follows:

"As between immediate parties, * * * the delivery, in order to be effectual, must be made either by or under the authority of the party making, drawing, accepting or indorsing, as the case may be; and in such case the delivery may be shown to have been conditional or for a special purpose only, and not for the purpose of transferring the property in the instrument."

The evidence pertaining to delivery, succinctly stated, is as follows:

The note was, on its face, an unqualified promise to pay on demand; interest began to accrue on it at once and interest was paid on it from time to time; it was shown in the Bank's statements as an asset; it was put in to remedy the impairment of the capital stock; it was put in to avoid an assessment on the capital stock; it and the other notes were put into the assets of the Bank and worthless assets removed; Tholen, the cashier, testified that at the meeting with Savage when the question arose as to how the worthless notes were to be taken out of the assets of the Bank, that the defendant proposed that they, the directors, give their individual notes for the notes in question; that Savage said that it would be satisfactory to put their notes in place of the worthless ones, provided they would give him a satisfactory statement of their individual responsibility; the ledger of the Bank showed in the defendant's private account with the Bank, that at the time he executed and delivered the original note his account was credited with $3,000, and contemporaneously a check for $3,000 was drawn and signed by him, which wiped out the credit of $3,000, one entry offsetting the other; Tholen, the cashier, opened a directors' account on the books of the Bank and credited that account with the $45,000 of objectionable paper; the defendant's and the other directors' notes were collat-

eral in form, with a collateral clause referring to "various notes as per list attached"; Tholen testified that when the bank examiner called his attention to the fact that the notes did not bear interest, he, Tholen, told the directors to include it; that the reason he did was because a note that does not bear interest is not a liquid asset; and in 1923 the $13,000 note of Cole, which had a similar history as the note of the defendant was taken out of the Bank as bad, the other notes of the directors being allowed to remain as good assets of the Bank.

In our judgment, with the evidence as it is, the only claim that the defendant can plausibly make is that there was a manual delivery of the notes to the Bank, with an understanding among the directors as individuals, and an intention on their part that they, their individual notes, should then at once become binding obligations on them, the makers, to the Bank, and that it was contemporaneously understood and orally agreed among them as individuals at that time that if at some future time, not specifically designated, the Bank did not need them to maintain its solvency, they should be returned; and in our judgment, it is the law, as claimed by counsel for the Bank, that all evidence as to the oral condition alleged to have been agreed upon among the directors as individuals was inadmissible.

The claim of the defendant is that the note qua note never became binding, enforceable obligation which could be collected by suit, and that the evidence introduced was to that effect. In our opinion, however, the delivery of the note was consummated and intended to be not only manually, but as immediate legal evidence of a present obligation; and any oral agreement or agreement that its payment—it was payable on demand and drew interest—was to depend on whether at some uncertain times in the future there was a run on the Bank and the Bank needed the proceeds of the note to pay its depositors, being an effort merely to affect the

question of when if at all it should be paid, was inadmissible. Wigmore on Evidence (2nd Ed.), vol. 5, §§ 2410, 2444; *Handley v. Drum*, 237 Ill. App. 587. Counsel for the defendant, referring to the defendant's note, says, "It had some immediate effect as security but not as an effective instrument." With that limitation we cannot agree; the evidence is overwhelmingly to the contrary.

(d) As to the alleged agreement being binding on the Bank. We are of the opinion that it was not. As we have stated above, no legal act of the Bank is shown which bound it to any such conditions.

(e) In view of what we have already said, it makes no difference whether the Bank, since the receipt of the notes, has needed them for the benefit of its depositors and to maintain its solvency.

(f) As to errors in instructions. We find none of any substantial import.

Considering what the record discloses: that the trial court permitted all the evidence to go to the jury; that no error was committed which was prejudicial to the defendant; that the jury was instructed to the obvious advantage of the defendant; that the jury found for the plaintiff, we are not justified in overriding the verdict or in reversing the judgment. For the reasons stated the judgment is affirmed.

*Affirmed.*

HOLDOM, P. J., and WILSON, J., concur.